UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| CLAY JAMES CARTER,<br><br>Plaintiff,<br><br>v.<br><br>TRAVIS MARVIN KENISON, ZERA AUGUSTUS ROWLEY, CHASE NATHAN OLIVER, JUAB COUNTY, and John Does I-V,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [ECF NO. 59] DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br><br>Case No. 2:24-cv-00515-DBB-JCB<br><br>District Judge David Barlow |

Before the court is Plaintiff Clay James Carter's Second Amended Complaint,[1] Defendants Travis Marvin Kenison, Zera Augustus Rowley, Chase Nathan Oliver, and Juab County's Motion to Dismiss,[2] Plaintiff's response brief,[3] and Defendants' reply.[4] Mr. Kenison, Mr. Rowley, and Mr. Oliver (the "Individual Defendants") are Sheriff's deputies employed by Juab County and Juab County Sheriff's Office.[5] Mr. Carter, a private citizen, was arrested by the Individual Defendants. Mr. Carter brings this action for damages under 42 U.S.C. § 1983, alleging that: (1) Defendants arrested him unlawfully; (2) Defendants used excessive force in the course of the arrest; (3) Defendants failed to intervene to stop the use of excessive force; and (4) Juab County is liable for the actions of the Individual Defendants as a municipality under *Monell*

---

[1] Second Am. Compl. ("Compl."), ECF No. 49, filed December 10, 2025.
[2] Defs.' Mot. to Dismiss Second Am. Compl. ("MTD"), ECF No. 59, filed March 5, 2026.
[3] Resp. to Defs.' Mot. to Dismiss ("Resp."), ECF No. 65, filed April 16, 2026.
[4] Defs.' Reply in Supp. of Mot. to Dismiss Second Am. Compl. ("Reply"), ECF No. 69, filed May 14, 2026.
[5] Compl. ¶¶ 2–5.

*v. Dep't of Soc. Servs. of City of New York.*[6] Having reviewed the briefing and the case law, the court finds that oral argument is not necessary.[7]

## BACKGROUND[8]

This civil action stems from an incident between Mr. Carter and the Individual Defendants in the evening on September 30, 2022. Earlier that day, Deputy Rowley and Mr. Carter were at Janet Carter's land.[9] Janet Carter is Mr. Carter's mother.[10] Mr. Carter told Deputy Rowley that he had driven down the country road adjacent to Ms. Carter's land to see if certain horses were visible because a third party told him that the horses were loose and might run away.[11] Mr. Carter owns or has potential legal claims to some of the horses that were reportedly loose.[12]

At some point during the day, Deputy Rowley told Ms. Carter that "if the Sheriff's Department could sue Mr. Carter for harassment, they would," and that they "held a grudge against Mr. Carter for years."[13]

In the evening, Mr. Carter attended a local rodeo in Nephi, Utah, at the Juab County Fairgrounds.[14] Deputies Kenison, Rowley, and Oliver were at the rodeo, in uniform, to provide security and first responder services as part of the rodeo's contract with the Juab County Sheriff's Department.[15]

---

[6] Compl. ¶¶ 113–151; *see also Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).
[7] *See* DUCivR 7-1(g).
[8] Because the court is deciding a motion to dismiss, the following factual allegations taken from Mr. Carter's Second Amended Complaint are treated as true.
[9] *Id.* ¶ 46.
[10] *Id.* ¶ 45.
[11] *Id.* ¶ 46.
[12] *Id.*
[13] *Id.* ¶¶ 102–03.
[14] *Id.* ¶ 13.
[15] *Id.* ¶ 14–15.

Brady Taylor—the husband of a local victim rights advocate—saw Mr. Carter and called Deputy Rowley to report that he was at the rodeo.[16] Deputy Rowley, Deputy Kenison, and Deputy Oliver then arrived at Mr. Carter's seat and ordered Mr. Carter to come with them.[17] Mr. Carter, without resisting, walked with the deputies to the rodeo's exit.[18]

There, Deputy Rowley asked Mr. Carter about a horse missing from Janet Carter's land.[19] Mr. Carter stated that he did not know where the missing horse was.[20] Deputy Rowley stated, "Well, the sorrel [horse] is gone."[21] Mr. Carter stated, "I told you I was down there looking for it."[22] Deputy Rowley asked to confirm that Mr. Carter admitted to being "down there" earlier that day."[23] Mr. Carter again stated that he "went down there looking for it."[24]

At that point, Deputy Rowley instructed Mr. Carter to turn around and put his hands behind his back, grabbed Mr. Carter's wrist, and handcuffed him.[25] The complaint then alleges: "One of the deputies struck Mr. Carter from behind."[26] "Deputies Rowley, Kenison, and Oliver then slammed Mr. Carter against a food truck."[27] "Deputy Rowley, using his knee, struck Mr. Carter in the knee."[28] "Deputies Kenison and Oliver twisted Mr. Carter's arm."[29] Despite protests from Mr. Carter informing the deputies of his already injured wrist, "Deputy Rowley repeatedly struck Mr. Carter's knee again, and deputies Kenison and Oliver continued to twist

---

[16] *Id.* ¶¶ 21–22.
[17] *Id.* ¶ 24.
[18] *Id.* ¶¶ 32, 36, 38, 41.
[19] *Id.* ¶ 52.
[20] *Id.*
[21] *Id.* ¶ 54.
[22] *Id.* ¶ 55.
[23] *Id.* ¶ 56.
[24] *Id.* ¶ 57.
[25] *Id.* ¶ 59.
[26] *Id.* ¶ 60.
[27] *Id.* ¶ 61.
[28] *Id.* ¶ 62.
[29] *Id.* ¶ 63.

Mr. Carter's arm."[30] "During this altercation Deputies Kenison and Oliver did not attempt to stop Deputy Rowley from striking Mr. Carter's knee."[31] And while Mr. Carter "initially and reflexively resisted the sudden physical action," he "immediately restrained himself and did not resist the arrest."[32]

After this altercation, the deputies took Mr. Carter to a police truck and sat him in the back seat.[33] Deputy Rowley stated that Mr. Carter had been "belligerent" and that he had enough "probable cause" to "detain and interview him."[34] A deputy also stated that Mr. Carter had been advised about what he was accused of doing.[35] The deputies exchanged additional questions and statements with Mr. Carter and then read him his Miranda rights.[36] The deputies claimed they had a basis for the arrest because Mr. Carter had been where the horses were kept, and now the sorrel horse was gone.[37] Mr. Carter continued to admit that he had been down there, but said that he did not see any of the horses.[38]

The deputies then took Mr. Carter to the local jail and continued to question him.[39] The deputies claimed that Mr. Carter's belligerence had justified the arrest.[40] But the deputies admitted "multiple times" that they knew Mr. Carter was never a threat to them.[41] Deputy Rowley stated, "I'm not afraid of you, seriously Clay" and "I know you wouldn't [hurt me]."[42] The deputies continued to question Mr. Carter despite him asserting his Miranda rights to an

---

[30] *Id.* ¶ 64.
[31] *Id.* ¶ 66.
[32] *Id.* ¶ 67.
[33] *Id.* ¶ 84.
[34] *Id.* ¶¶ 79, 81, 85.
[35] *Id.* ¶ 77.
[36] *Id.* ¶ 87.
[37] *Id.* ¶ 69.
[38] *Id.* ¶ 71.
[39] *Id.* ¶ 88.
[40] *Id.* ¶ 90.
[41] *Id.* ¶ 91.
[42] *Id.* ¶ 93.

attorney.[43] The deputies claimed during the questioning that they had a sufficient legal and factual basis to charge Mr. Carter.[44] But ultimately, the deputies released Mr. Carter without filing charges.[45]

After the interrogation, the deputies drove Mr. Carter back to the rodeo.[46] Despite Mr. Carter's request to drop him off close to the stands, the deputies pulled over far from the stands.[47] They explained that they did not want anyone to see them dropping him off.[48]

During the arrest, Mr. Carter's wrist was broken, and he experienced pain and swelling in his knee.[49] The injuries required surgery and will likely require more surgeries.[50] The complaint alleges that since the incident, beginning in August of 2025, Mr. Carter and his associates have been involved in disputes with County officials concerning grazing rights and access to county roads.[51] Specifically, conflict has arisen regarding "the removal of cattle guards and the seizure of temporary gate panels owned by Mr. Carter's associates."[52] Juab County Commissioner Marv Kenison has involved himself in the enforcement actions against Mr. Carter's associates.[53] Marv Kenison is the father of Deputy Kenison.[54] On one occasion, Marv Kenison told an associate of Mr. Carter's that "these gates are going to be the last of your worries based on how we are going to go after Clay."[55] On a separate occasion, another deputy

---

[43] Id. ¶ 96.
[44] Id. ¶ 97.
[45] Id. ¶ 99.
[46] Id. ¶ 104.
[47] Id.
[48] Id. ¶ 105.
[49] Id. ¶¶ 106–07.
[50] Id. ¶ 108.
[51] Id. ¶ 8.
[52] Id.
[53] Id. ¶ 9.
[54] Id.
[55] Id.

within the Juab County Sheriff's Department stated to Mr. Carter that the Department had "made things way too personal against [him]."[56]

## STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint "for failure to state a claim upon which relief can be granted."[57] In evaluating a Rule 12(b)(6) motion to dismiss, the court "accept[s] all facts pleaded by the nonmoving party as true and grant[s] all reasonable inferences from the pleadings in favor of the same."[58] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[59] In order for a plaintiff's claim to survive, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[60] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[61] But the court is "not bound to accept as true a legal conclusion couched as a factual allegation,"[62] as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."[63]

---

[56] *Id.* ¶ 10.

[57] Fed. R. Civ. P. 12(b)(6).

[58] *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (quoting *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, PA*, 442 F.3d 1239, 1244 (10th Cir. 2006) (abrogated on other grounds)).

[59] *Id.* (quoting *Park Univ. Enters., Inc.*, 442 F.3d at 1244).

[60] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[61] *Id.* at 663.

[62] *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

[63] *Id.*

**DISCUSSION**

Defendants argue that (1) the Individual Defendants are entitled to qualified immunity; (2) Plaintiff failed to state a claim for municipal liability under *Monell*; and (3) the complaint should be dismissed with prejudice. The court considers each argument in turn.

## I.      Qualified Immunity

Defendants assert that the Individual Defendants are entitled to qualified immunity on the (A) unlawful arrest, (B) excessive-force, and (C) failure-to-intervene claims. Plaintiff responds that the complaint alleges sufficient factual matter to meet his burden under the qualified immunity standard. Generally, "the doctrine of qualified immunity shields officers from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[64] To overcome the defense, "the onus is on the plaintiff to demonstrate '(1) that the official violated statutory or constitutional rights, and (2) that the right was clearly established at the time of the alleged conduct.'"[65] The court may analyze the two prongs in either order.[66] If a plaintiff fails to establish either prong, the defendant prevails.[67]

A plaintiff must demonstrate that the right allegedly violated was clearly established "by identifying an on-point Supreme Court or published Tenth Circuit decision," or showing that "the clearly established weight of authority from other courts . . . found the law to be as the

---

[64] *Tahlequah v. Bond*, 595 U.S. 9, 12 (2021) (citation modified).
[65] *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).
[66] *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009) ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").
[67] *See, e.g., A.M. Holmes*, 830 F.3d 1123, 1134–35 (10th Cir. 2016).

plaintiff maintains."[68] And although the "plaintiff need not locate a *perfectly* on-point case,"[69] "the rule's contours must be so well defined that 'it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'"[70] Police officers "can still be on notice that their conduct violates established law even in novel factual circumstances"[71] so long as precedent "place[s] the . . . constitutional question beyond debate."[72] This specificity is "especially important in the Fourth Amendment context" where it can be "difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts."[73] In short, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law."[74]

### A.    Unlawful Arrest[75]

Plaintiff first alleges that the Individual Defendants violated his clearly established Fourth Amendment right by arresting him without a warrant and under circumstances that were insufficient to establish probable cause.[76] Defendants counter that the Individual Defendants had at least arguable probable cause, and that Plaintiff's authority on the clearly established prong is distinguishable.[77]

---

[68] *Quinn*, 780 F.3d at 1005 (quoting *Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010)); *see also Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1497 ("While the plaintiff need not show that the specific action at issue has previously been held unlawful, the alleged unlawfulness must be apparent in light of preexisting law.") (citations modified).

[69] *Quinn*, 780 F.3d at 1005.

[70] *Tahlequah*, 595 U.S. at 11 (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

[71] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

[72] *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quoting *White v. Pauly*, 580 U.S. 73, 78–89 (2017)).

[73] *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (noting that police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue); *see also Kisela*, 584 U.S. at 105 (acknowledging that the Fourth Amendment existing precedent must "provide an officer notice that specific use of force is unlawful.").

[74] *Tahlequah*, 595 U.S at 12 (quoting *Wesby*, 583 U.S. at 63).

[75] Defendants urge the court to take judicial notice of the public records attached to their Answer to Amended Complaint as part of the unlawful-arrest analysis. But because taking judicial notice of those records would not change the disposition of the claim, the court declines to do so.

[76] Compl. ¶¶ 114–18.

[77] MTD 8–10.

Generally, "a police officer violates an arrestee's clearly established Fourth Amendment right to be free of unreasonable seizure if the officer makes a warrantless arrest without probable cause."[78] Under the qualified immunity standard, a law enforcement officer is protected so long as "a reasonable officer *could have* believed that probable cause existed to arrest the plaintiff."[79] Even officers who "reasonably but mistakenly conclude that probable cause is present" have arguable probable cause and are protected by qualified immunity.[80]

Probable cause exists "if facts and circumstances within the arresting officer's knowledge . . . are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense."[81] It is "not a high bar,"[82] requiring only "a probability or substantial chance of criminal activity."[83] The inquiry is objective, requiring courts to examine the "events leading up to the arrest, and then decide whether these historical facts, viewed from the perspective of an objectively reasonable police officer, amount to probable cause."[84] That objective inquiry means that officers "may not ignore easily accessible evidence"[85] or entirely delegate their probable cause inquiry to a third party without making an independent

---

[78] *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).

[79] *Id.* at 1312 (emphasis added).

[80] *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) (citation modified); *see also Shimomura v. Carlson*, 811 F.3d 349, 361–62 (10th Cir. 2015) (noting that even "arguable probable cause" is sufficient to establish qualified immunity for an officer in the absence of actual probable cause).

[81] *Jones v. City & Cnty. of Denver, Colo.*, 854 F.2d 1206, 1210 (10th Cir. 1998) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (noting that the probable cause determination asks "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.")); *see also Hunter v. Bryant*, 502 U.S. 224, 227–28 (1991) (emphasizing that the relevant question is whether a reasonable officer could have believed there was probable cause on the facts and circumstances then known to the officers).

[82] *Kaley v. United States*, 571 U.S. 320, 338 (2014).

[83] *Wesby*, 583 U.S. at 57.

[84] *Id.* at 56.

[85] *Baptiste v. J.C. Penney*, 147 F.3d 1252, 1259 (10th Cir. 1998); *see also Lusby v. T.G. & Y. Stores, Inc.*, 749 F.2d 1423, 1431–33 (10th Cir. 1984) (holding an officer liable under the Fourth Amendment for arresting the plaintiff based solely on an off-duty security guard's testimony and without conducting any independent investigation at all into whether probable cause existed) *cert. granted, judgment vacated on other grounds, Lawton v. Lusby*, 474 U.S. 805 (1985). The Supreme Court vacated the decision for the Tenth Circuit to reconsider whether a newly issued Supreme Court case affected *Lusby*'s analysis of municipal liability—an issue entirely separate from that considered here. *See Lusby v. T.G. & Y. Stores, Inc.*, 796 F.2d 1307 (10th Cir. 1986).

investigation.[86] And "a person's mere [proximity] to others independently suspected of criminal activity does not, without more, give rise to probable cause."[87]

Here, Plaintiff relies on three cases to argue that it was clearly established that the Individual Defendants did not have probable cause when they arrested him. The authority stands for three propositions: (1) probable cause does not exist when officers ignore "readily available evidence contradicting the accusation";[88] (2) probable cause does not exist when an officer relies on a third party's accusation alone with "no independent investigation";[89] and (3) mere physical proximity to others suspected of criminal activity "does not, without more, give rise to probable cause."[90] Even taking Plaintiff's well-pleaded fact allegations as true, the circumstances of this arrest differ materially from Plaintiff's cases.

First, the Individual Defendants did not disregard readily available exculpatory evidence. Plaintiff argues that the officers ignored his explanation for why he was near the location of the sorrel horse, comparing this to *Baptiste v. J.C. Penney*. There, the officers overlooked video evidence and receipts showing the "stolen" item had been purchased. Plaintiff's claim to have had an innocent reason for being at the scene of a potential crime is not clearly exculpatory evidence like a receipt showing that an item had not been stolen. To the contrary, Plaintiff's statement that he had been looking for the sorrel horse could reasonably give the Individual Defendants more, not less, reason to suspect Plaintiff—the opposite of the conclusively exculpatory evidence the *Baptiste* officers ignored. The facts here are not analogous.

---

[86] *See Lusby*, 749 F.2d at 1431 (10th Cir. 1984); *Baptiste*, 17 F.3d at 1259–60.
[87] *Ybarra v. Illinois*, 444 U.S. 85, 91–92 (1979).
[88] *See Baptiste*, 147 F.3d at 1256.
[89] *See Lusby*, 749 F.2d at 1434.
[90] *See Ybarra*, 444 U.S. at 91.

Second, unlike the officers in *Lusby v. T.G. & Y. Stores, Inc.*, the Individual Defendants did not rely solely on a third-party's accusation. Plaintiff argues that Defendants relied on a tip from Brady Taylor to establish probable cause. But the complaint alleges that Mr. Taylor merely called the officers to report that Plaintiff was in attendance at the rodeo, not that Mr. Taylor accused Plaintiff of any criminal activity.[91] The complaint further alleges that the Individual Defendants knew Plaintiff had admitted to being at the location of the missing sorrel horse earlier that day and was actively looking for it[92]—facts that provide an independent basis for the arrest apart from any third-party report. The *Lusby* officers, by contrast, relied entirely on a third party's report alleging that the plaintiff had stolen something, without pursuing readily available evidence or conducting any independent investigation.[93] The Individual Defendants' probable-cause determination here was independent of Mr. Taylor's later call.

Finally, while mere proximity to those suspected of a crime cannot, by itself, supply probable cause, the complaint here alleges more than proximity. In *Ybarra v. Illinois*, the officers had a search warrant for a tavern and a specific bartender who was reportedly selling heroin.[94] Upon executing the search warrant, the officers also searched the plaintiff on the sole basis that the plaintiff also was at the tavern.[95] But the Supreme Court reasoned that probable cause cannot simply be transferred from one person to another because of their coincidental physical proximity.[96] Indeed, "a person's mere [proximity] to others independently suspected of criminal

---

[91] Compl. ¶ 22 ("Brady Taylor had called Deputy Rowley and told them that Clay Carter was at the rodeo.").
[92] *Id.* ¶ 46.
[93] *Lusby*, 749 F.2d at 1434.
[94] *Ybarra*, 444 U.S. at 88.
[95] *Id.* at 90–91.
[96] *Id.* at 89–91 ("Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places.").

activity does not, without more, give rise to probable cause to search that person."[97] Rather, probable cause has to be "particularized" with respect to a specific individual.[98] Here, the Individual Defendants' probable cause determination was particularized to Plaintiff and was not based on Plaintiff's proximity to another suspected of criminal behavior. The complaint alleges that the Individual Defendants knew Plaintiff had been at the scene *and* that he admitted searching for the sorrel horse that went missing that same day.[99] Unlike the tavern patron, Plaintiff was not at the scene of the potential crime coincidentally—he was admittedly there for a purpose related to the potential crime. Beyond that, a rural country field is nothing like a business open to the public where patrons would have a reason to be. And Plaintiff also had potential motive to take the sorrel horse because of his legal claims to the horse.[100] Overall, the complaint here alleges particularized, non-coincidental bases for the probable cause determination, not that Plaintiff had been arrested for being near someone else suspected of criminal activity. Thus, the *Ybarra* facts are not sufficiently similar to clearly establish that the officers did not have arguable probable cause.

Ultimately, none of the cited cases are similar enough to this fact pattern to place the unlawfulness of the Individual Defendants' conduct beyond debate. The complaint instead supplies facts on which a reasonable officer could at least have been mistaken about the existence of probable cause. Especially in the Fourth Amendment context, the absence of a clearly defined line demarcating unlawful conduct weighs heavily against Plaintiff's burden to show a violation of clearly established law.[101] And even though the unlawfulness of such

---

[97] *Id.* at 91.

[98] *Id.*

[99] Compl. ¶¶ 46, 55–57.

[100] *Id.* ¶ 46.

[101] *Mullenix*, 577 U.S. 7 at 11 (noting that police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue); *see also Kisela*, 584 U.S. at 104–05 (acknowledging that the Fourth Amendment existing precedent must "provide an officer notice that specific use of force is unlawful.").

conduct can be shown to be clearly established in novel circumstances,[102] Plaintiff's cited authority has not done so. As a result, Plaintiff failed to meet his burden to establish the second prong of the qualified immunity analysis.

Although Plaintiff's failure to meet one prong means the court need not address the other prong, the complaint independently establishes at least arguable probable cause. The burden is on Plaintiff to demonstrate that no reasonable officer could have believed even arguable probable cause existed. Plaintiff has not met that burden. To the contrary, the complaint's own allegations permit the conclusion that a reasonable officer in the Individual Defendants' position had substantial reason to believe that probable cause existed.

Indeed, Deputy Rowley encountered Plaintiff at the very location where the sorrel horse was reported missing, Plaintiff admitted he had been driving the adjacent road looking for the same horses, and Plaintiff had potential legal claims regarding the missing horses. Even if Plaintiff characterized his presence as innocent, his proximity to the object of the crime, his admission that he had been surveying the area from which the sorrel horse disappeared, and Plaintiff's potential motive were properly among the factors the Individual Defendants could weigh. Taken together, a prudent officer in the same position could reasonably believe that the Plaintiff had committed a theft. At a minimum, it was arguable that probable cause existed, even if the Individual Defendants were mistaken as to its actual existence. Because Plaintiff has not shown that no reasonable officer viewing these circumstances could have believed that probable cause existed, the Individual Defendants had at least arguable probable cause at the time of the

---

[102] *See Hope*, 536 U.S. at 741.

arrest, and Plaintiff fails to meet the first prong of the qualified immunity standard. Accordingly, the court dismisses Plaintiff's unlawful arrest claim against the Individual Defendants.[103]

###### B.      Excessive Force

Generally, the Fourth Amendment forbids the use of excessive force in making an arrest.[104] Excessive force claims are evaluated under an objective reasonableness standard, judging the force at issue "from the perspective of a reasonable officer on the scene."[105] Proper application of the reasonableness standard "requires careful attention to the facts and circumstances of each particular case," including considering (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest."[106] The standard also accounts for the reality that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[107] In situations where a plaintiff does resist arrest, the relevant inquiry is whether the force used was "reasonable and proportionate" to that resistance.[108] And although some force may be justified against a resisting plaintiff, "continued and increased use of force against a subdued detainee is not," even where the detainee resisted initially.[109]

---

[103] Defendants also argued that Plaintiff's resistance to arrest justified making the arrest. Since the court finds that the potential theft of the sorrel horse provided at least arguable probable cause and that Plaintiff failed to show the conduct violated clearly established law, there is no need to address this additional argument.

[104] *See Hooks v. Atoki*, 983 F.3d 1193, 1200 (10th Cir. 2020).

[105] *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016); *see also Graham v. Connor*, 490 U.S. 386, 396–97 (1989) ("As in other Fourth Amendment contexts, however, the reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.") (citation modified).

[106] *Graham*, 490 U.S. at 396.

[107] *Id.* at 396–97.

[108] *Perea*, 817 F.3d at 1203.

[109] *Id.*

For example, in *Dixon v. Richer*, the court found excessive force sufficient to defeat qualified immunity where a police officer kicked, choked, and beat a plaintiff who was not making any "aggressive moves or threats" and had his hands up against a van with his back to the officers.[110] The court reasoned that even in a novel factual circumstance, a plaintiff's alleged resistance to such force did not justify the use of force when the plaintiff was under control.[111] Similarly, in *Perea v. Baca*, the court held that "continued and increased force against a subdued detainee" was clearly excessive relative to the suspect's initial resistance and actual ability to resist the arrest at that moment.[112]

Here, Defendants point out that while force "against a non-resisting, fully subdued suspect" is unconstitutional, the complaint alleges that Plaintiff "initially and reflexively" resisted arrest. Defendants argue that because of this initial resistance, Plaintiff cannot establish excessive force under his cited authority, which only addresses force used after a subject was subdued and no longer resisting.[113] Plaintiff responds that the timeline shows he had stopped resisting and was subdued before the Individual Defendants used excessive force by fracturing his wrist and repeatedly striking his leg.[114]

At this stage, taking the well-pleaded facts alleged to be true and drawing all reasonable inferences in Plaintiff's favor, the timeline of the incident alleged in the complaint suggests that, although Plaintiff initially resisted, the force which caused Plaintiff's injuries was applied after

---

[110] *See Dixon v. Richer*, 922 F.3d 1456, 1463 (10th Cir. 1991).

[111] *Id.* at 1463–64; *see also Perea*, 817 F.3d at 1204 ("It is . . . clearly established law in the Tenth Circuit that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force.").

[112] *See Perea*, 817 F.3d at 1202–04.

[113] MTD 10–11.

[114] Resp. 16–17.

he had ceased any resistance and was compliant.[115] The reasonableness of that force must therefore be assessed as of the moment it was applied. Measured at that time, Plaintiff has sufficiently pled that the Individual Defendants used excessive force.

As to the first factor, the severity of the alleged crime, theft is a nonviolent offense. While this does not categorically preclude the use of any force, the nature of the offense is such that generally less force is warranted. This factor weighs in Plaintiff's favor. Defendants do not dispute this factor.

The second factor, which considers the threat Plaintiff posed to the officers or others, likewise weighs in Plaintiff's favor. The complaint alleges that Plaintiff was not a threat to the Individual Defendants who themselves admitted they were "not afraid" of Plaintiff and "knew [he] wouldn't hurt [them]" during the arrest.[116] It further alleges that Plaintiff complied with the officers' instructions while leaving the stadium, was answering the officers' questions, and that the incident occurred away from any others, making it unlikely anyone else was threatened even during Plaintiff's initial resistance. Defendants do not dispute that Plaintiff was not a threat under this factor.

The third factor considers the arrestee's active resistance. As noted, the complaint's well-pleaded allegations establish that, although Plaintiff initially resisted, the Individual Defendants kicked his knee and twisted his arm to the point of fracture after he had abandoned that initial, reflexive resistance. The reasonableness of their force must therefore be judged as of the moment it was applied when, on the alleged facts, Plaintiff was subdued and compliant. And "[a]lthough

---

[115] Compl. ¶¶ 3, 60–67 ("During the unlawful arrest, the Individual Defendants . . . [struck] Mr. Carter from behind, slam[ed] him against a food truck, str[uck] his knee, and twist[ed] his arm with enough force to break his wrist, *all while Mr. Carter was compliant and not resisting.*").
[116] Compl. ¶ 93.

use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not."[117] Thus, this factor weighs in Plaintiff's favor.

As in *Dixon*, the allegations suggest that Plaintiff was under control and non-resisting when the Individual Defendants struck Plaintiff multiple times and applied force sufficient to fracture his wrist and require multiple surgeries. Under the cited authority, no reasonable officer would believe such force necessary against an arrestee whose alleged crime was relatively minor and nonviolent, who posed no threat to the officers or anyone else, and who had already stopped resisting and was effectively subdued. Indeed, Defendant's argument that Plaintiff's admission of initial resistance defeats the claim rests on Defendants' own version of the timeline, which assumes Plaintiff resisted throughout the application of force. But this framing does not control at the motion-to-dismiss stage. Taking the complaint's allegations as true, as the court must, the complaint adequately pleads that the Individual Defendants applied disproportionate force to a subdued, non-resisting Plaintiff.

The law is also clearly established. In the excessive-force context, "the more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."[118] The Tenth Circuit has also previously ruled that "it is likewise clearly established that officers may not continue to use force against a suspect who is effectively subdued."[119] Here, the Amended Complaint sufficiently alleges that Plaintiff was effectively subdued and compliant, but the Individual Defendants continued to kick him and twist his arm to the point of fracture.

---

[117] *Perea*, 817 F.3d at 1203.

[118] *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004); *see also Casey v. City of Federal Heights*, 509 F.3d 1278, 1284–85 (10th Cir. 2007) (establishing a "sliding scale" approach to the clearly established prong of qualified immunity in the context of excessive force claims: "when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, we do not require a second decision with greater specificity to clearly establish the law.").

[119] *Perea*, 817 F.3d at 1204.

In sum, no reasonable officer in the Individual Defendants' position would believe it lawful, on the alleged facts, to fracture Plaintiff's wrist or apply force that was sufficient to require multiple surgeries on an arrestee who had been effectively subdued, whose alleged crime was relatively minor, and who posed no threat to officers or anyone else. Accordingly, the excessive force claim is not dismissed.

### C.     Failure to Intervene

Next, Defendants challenge Plaintiff's claim that Deputy Rowley is liable for failing to prevent the excessive force used by Deputies Kenison and Oliver, and that Deputies Kenison and Oliver are liable for failing to prevent the excessive force used by Deputy Rowley.[120] Under Tenth Circuit precedent, "all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."[121] Defendants' sole argument for dismissal is that Plaintiff has not shown a constitutional violation.[122] However, the court found that Plaintiff asserted a plausible excessive force claim on the alleged facts. Thus, the court will not dismiss Plaintiff's failure to intervene claim.

### II.     Municipal Liability

Plaintiff's final claim alleges that, because of the constitutional violations the Individual Defendants committed while acting under the authority of Juab County, the County itself is liable under 42 U.S.C. § 1983 and *Monell*.[123] Defendants counter that the complaint fails to meet *Monell*'s requirements for municipal liability.[124] Under *Monell*, a municipality is liable in a

---

[120] Compl. ¶¶ 133–39.
[121] *Vondrak v. Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008).
[122] MTD 12.
[123] Compl. ¶¶ 140–51.
[124] MTD. 12–13.

§ 1983 action "only when the municipality itself causes the constitutional violation at issue."[125] "To establish municipal liability, a plaintiff must show (1) the existence of a municipal policy or custom, and (2) that there is a direct causal link between the policy or custom and the injury alleged."[126] Because Plaintiff has sufficiently stated an excessive force claim at this stage, the court recognizes an underlying constitutional violation as the predicate for the *Monell* claim.

A constitutional violation "is caused by a municipal policy if it results from decisions of a duly constituted legislative body or an official whose acts may be fairly said to be those of the municipality itself."[127] For purposes of municipal liability, a policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."[128]

---

[125] *Canton v. Harris*, 489 U.S. 378, 387; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 397–98 (1997) (requiring the showing of a direct "causal link" between the acts of the municipality and the alleged constitutional violation).

[126] *Hinton v. Elwood*, 997 F.2d 774, 782 (10th Cir. 1993)*; See also Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404 ("[I]t is not enough for a plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.") (citations modified).

[127] *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008); *see also Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404–05 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee.").

[128] *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189–90 (10th Cir. 2010) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) and *Canton*, 489 U.S. at 388–91) (internal quotation marks omitted).

## A.  Custom, Policy, or Final Policymaker Conduct

Plaintiff alleges that Defendants' actions were part of a widespread Juab County custom of "utilizing law enforcement authority to harass citizens based on personal animus."[129] Plaintiff supports this allegation with conduct by both individual deputies within the Juab County Sheriff's Department and County Commissioner Marv Kenison. Specifically, Plaintiff alleges that in 2025 Commissioner Kenison was personally involved in enforcing civil disputes over cattle guards and gate panels owned by Plaintiff's associates, that Deputy Finlinson told Plaintiff that the Juab County Sheriff's Office "had made things way too personal against [him,]"[130] and that on the day of the arrest Deputy Rowley stated that he "had held a grudge against Mr. Carter for years" and that "if the Sheriff's Department could sue Mr. Carter for harassment, they would."[131]

On these facts, Plaintiff alleges that his arrest was motivated by a municipal custom of personal animus directed at him, to which County policymakers acquiesced.[132] Defendants respond that Plaintiff has not plausibly alleged a custom or policy sufficient to establish municipal liability.[133]

Defendants argue that under Utah law, County Commissioner Marv Kenison is not a "final policymaker" for purposes of municipal liability.[134] Plaintiff does not dispute this argument, instead asserting that his argument does not rely on Commissioner Kenison being a final policymaker.[135] Thus, the court considers it conceded that Commissioner Kenison is not a final policymaker for law enforcement. Plaintiff's first theory, therefore, hinges on plausibly

---

[129] Compl. ¶ 143.
[130] Id. ¶ 10.
[131] Id. ¶¶ 102–03.
[132] Id. ¶¶ 140–46.
[133] MTD 13–14.
[134] Id. at 14.
[135] Resp. 21.

alleging an informal custom of personal animus and retaliation against him that "is so permanent and well settled as to constitute a custom or usage with the force of law."[136] Plaintiff has failed to do so.

The court previously noted Plaintiff's failure to allege more than a single instance of harassment amounting to a widespread custom or pattern of abusing police power to settle personal grudges.[137] The complaint adds only two facts to attempt to cure that deficiency: a 2025 instance of a County Commissioner aiding in the enforcement of civil disputes against Plaintiff's associates[138] and remarks by a Sheriff's deputy indicating that the Department had made things "way too personal against" him.[139] Neither suffices. As to the Commissioner, it is unclear how a non-final policymaker's actions against Plaintiff's acquaintances demonstrate a widespread custom of harassing Plaintiff based on personal animus. The complaint does not even allege that the civil disputes were enforced unfairly, amounted to an abuse of power, violated similar constitutional rights, or targeted Plaintiff at all. And because Marv Kenison is not a final policymaker, his alleged acquiescence in the Individual Defendants' conduct cannot constitute the kind of ratification that establishes a custom under *Monell*.

As to the grudges, Plaintiff alleges no instance, other than the alleged harassment at issue here, in which that animus materialized into abuse against Plaintiff or against anyone else. Neither has Plaintiff alleged additional constitutional violations arising from the supposed custom of acting out of personal animus and abusing police authority. And in any event, that multiple deputies may have held personal grudges does not, without more, establish a custom so

---

[136] *Brammer-Hoelter*, 602 F.3d at 1189 (quoting *Adickes v. S.H. Kress & Co.*, 389 U.S. 144, 167–68 (1970)).
[137] Mem. Decision and Order Granting Defs.' Mot. for J. on the Pleadings 12, ECF No. 47, filed November 10, 2025.
[138] Compl. ¶ 8–9.
[139] *Id.* ¶ 10.

pervasive as to carry "the force of law."[140] In short, rather than a widespread abuse of police authority to target Plaintiff, the complaint still contains only a single alleged constitutional violation during the period at issue. The facts thus fall well short of a persistent pattern of the Sheriff's Department abusing its authority or acting on personal animus to harass Plaintiff and fail to plausibly allege the "permanent and well-settled" practice that municipal liability requires.[141]

### B.      Failure to Train

Plaintiff next asserts that Juab County is liable on a failure-to-train theory. The complaint alleges that the County acted with deliberate indifference by failing to train officers with "openly declared personal animus" on the distinction between personal grievances and probable cause, and on recusal.[142] Plaintiff then concludes that this training failure made it "plainly obvious" that "the violation of constitutional rights" would result.[143]

The Supreme Court has established that inadequate training may support § 1983 liability in "limited circumstances."[144] "[O]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983."[145] The "focus must be on the adequacy of the training program in relation to the tasks the particular officers must perform."[146] Deliberate indifference is shown by a

---

[140] *See Carney,* 534 F.3d at 1274; *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 404; *Lucas v. Turn Key Clinics*, 58 F.4th 1127, 1145 (10th Cir. 2023).
[141] *Brammer-Hoelter*, 602 F.3d at 1189.
[142] Resp. 23–24.
[143] *Id.*
[144] *Canton*, 489 U.S. at 387.
[145] *Id.* at 389 ("It may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").
[146] *Id.* at 390.

municipality's "continued adherence to an approach that [it] know[s] or should know has failed to prevent" the relevant constitutional violations, so as to demonstrate a "conscious disregard for the consequences" of the municipality's failure to train.[147] Finally, a plaintiff "must identify a specific deficiency" in the municipality's training program;[148] it is not enough to "prove that an injury or accident could have been avoided if an officer had had better or more training."[149]

The court previously noted that Plaintiff had failed to allege "a specific deficiency" in Juab County's training program.[150] Plaintiff has not cured that failure. Plaintiff states only that "the County failed to train deputies to distinguish between legitimate probable cause and personal grievances/retaliation,"[151] and that "had the Individual Defendants been properly trained, they would have known" that the arrest was unconstitutional.[152] These are conclusory allegations. Plaintiff alleges no facts about Juab County's training program. There is nothing about what it consisted of or how deputies were trained in the first place. Neither has Plaintiff identified a specific deficiency in the program. Plaintiff instead concludes that more or better training would have prevented the alleged unconstitutional arrest, without any particularity regarding what the training itself lacked or even how the Individual Defendants were trained in the conduct at issue. That is precisely what the Supreme Court has held is not enough to plead a failure-to-train claim.[153]

---

[147] *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 407; *see also Canton*, 489 U.S. at 397 (O'CONNOR, J., concurring in part and dissenting in part) ("[M]unicipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations ...").

[148] *Keith v. Koerner*, 843 F.3d 833 839 (10th Cir. 2016) (quoting *Lopez v. LeMaster*, 172 F.3d 756, 760 (10th Cir. 1999).

[149] *Canton*, 489 U.S. at 391.

[150] Mem. Decision and Order Granting Defs.' Mot. for J. on the Pleadings 12, ECF No. 47, filed November 10, 2025.

[151] Compl. ¶ 148.

[152] *Id.* ¶ 150.

[153] *See Canton*, 489 U.S. at 391 (noting that municipal liability is not established by "prov[ing] that an injury or accident could have been avoided if an officer had had better or more training," since "[s]uch a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal.").

Deliberate indifference also requires plausibly alleging "continued adherence" to an approach that the municipality "know[s] or should know has failed" to prevent the relevant constitutional violations.[154] On this point, Plaintiff alleges only that "Juab County acted with deliberate indifference to the rights of Mr. Carter by failing to train its deputies on the constitutional limitations of their power in the context of personal disputes."[155] But Plaintiff alleges no history of such constitutional violations against Plaintiff or anyone else. Without such a history of similar constitutional violations, there is no plausible basis to find that Juab County knew or should have known from its program's past failures that its training was inadequate. Plaintiff therefore does not plausibly allege the deliberate indifference a failure-to-train claim requires. Accordingly, the court dismisses Plaintiff's *Monell* claim.

## III.    Dismissal Without Prejudice

Defendants argue that the court's dismissal should be with prejudice.[156] "A dismissal with prejudice is appropriate where a complaint fails to state a claim under Rule 12(b)(6) and granting leave to amend would be futile."[157] Courts also consider whether a plaintiff has made multiple attempts to amend to survive a motion to dismiss and whether the complaint has changed little from one amendment to the next.[158] And because qualified immunity is "an immunity from suit rather than a mere defense to liability" whose "benefits are effectively lost if

---

[154] *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 407.

[155] Compl. ¶ 147.

[156] MTD 15.

[157] *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991); *see also Bylin v. Billings*, 568 F.3d 1224, 1229 (10th Cir. 2009) ("Refusing leave to amend is generally only justified upon a showing of . . . failure to cure deficiencies by amendments previously allowed, or futility of amendment.").

[158] *Matthews v. LaBarge, Inc.*, 407 Fed. App'x. 277, 280 (10th Cir. 2011) (it is not abuse of discretion to refuse third amended complaint when differences were immaterial); *Golod v. Bank of America*, 403 Fed. App'x. 699, 702 (3d Cir. 2010) (amendment futile after several failures by plaintiff to move complaint across line from conceivable to plausible); *Holmes v. Gates*, 403 Fed. App'x. 670, 673 (3d Cir. 2010) (complaint properly dismissed with prejudice after plaintiff failed three times to include facts beyond conclusory allegations).

a case is erroneously permitted to go to trial,"[159] the Supreme Court has "stressed the importance of resolving immunity questions at the earliest possible stage in litigation."[160]

The question is a close one. This case has been pending for some time, and Plaintiff has already had an opportunity to amend. However, Plaintiff has now partly cured the deficiencies the court identified in its previous dismissal—adding factual comparisons between the authority bearing on the qualified immunity standard and pleading some additional facts in support of the *Monell* claim. Plaintiff's ability to cure earlier deficiencies weighs against dismissal with prejudice at this time. And although the complaint remains wholly insufficient as to two claims, an amendment would not necessarily be futile because the court cannot yet conclude that Plaintiff is unable to plead facts that cure the deficiencies identified in this order. Accordingly, the unlawful arrest and *Monell* claims are dismissed without prejudice.

## ORDER

Defendants' Motion to Dismiss Second Amended Complaint[161] is GRANTED in PART and DENIED in PART. Plaintiff's unlawful arrest and *Monell* claims are dismissed without prejudice. Plaintiff's excessive force and failure to intervene claims are not dismissed.

Signed July 10, 2026.

BY THE COURT

David Barlow
United States District Judge

---

[159] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).
[160] *Pearson*, 555 U.S. at 232  (quoting *Hunter*, 502 U.S. at 227).
[161] ECF No. 59.